Puerto Rico Tobacco Corporation, demandante y apelada, *v.* Rafael Buscaglia, en su carácter de Tesorero de Puerto Rico, demandado y apelante.

Núm. 8602.—*Sometido:* Junio 9, 1943. *Resuelto:* Enero 18, 1944.

*Hon. Procurador General Interino M. Rodríguez Ramos (José Rafael Gelpí, Procurador General Auxiliar, en el alegato) y M. Velázquez Flores, Procurador Auxiliar, abogados del apelante; Clemente Ruiz Nazario, abogado de la apelada.*

EL JUEZ PRESIDENTE INTERINO SEÑOR TRAVIESO emitió la opinión del tribunal.

La demandante, Puerto Rico Tobacco Corporation, se dedica a la fabricación y venta de cigarrillos en Puerto Rico.

En junio 18 de 1939 (Leyes de 1939 (2) pág. 95), la Legislatura de Puerto Rico aprobó la Ley núm. 22 por la cual se condonaron las contribuciones sobre bienes muebles e inmuebles adeudadas por aquellos contribuyentes cuya deuda contributiva hasta el 30 de junio de 1938 no excedía de $400; y se redujeron en la suma de $400 las deudas contributivas que excedían de dicha suma. Se ordenó al Tesorero de Puerto Rico que cancelara los recibos correspondientes al año 1937–38 y años anteriores y también los embargos que se hubieren trabado para asegurar el cobro de contribuciones. Se dispuso, además, que los bienes subastados y adjudicados al Pueblo de Puerto Rico debían ser devueltos a sus anteriores dueños. Para tener derecho a la condonación era necesario

que el contribuyente pagase al Tesoro en o antes de diciembre 31 de 1939 las contribuciones correspondientes al ejercicio 1938-39 y el primer semestre del 1939-40 y el total de la deuda vencida en junio 30, 1938, menos la suma de $400.

Por la sección 6 de dicha ley, según fué enmendada por la núm. 149 de mayo 6 de 1940 (Leyes de 1940 pág. 895), se ordenó al Tesorero de Puerto Rico que contratara un empréstito con una persona natural o jurídica por la suma de dos millones doscientos cincuenta mil (2,250,000) dólares, la que sería utilizada para reembolsar a los municipios y a la Universidad de Puerto Rico las cantidades que dejarían de percibir como consecuencia de la condonación autorizada por la ley. El principal y los intereses de dicho empréstito deberían pagarse con el producto de una contribución o impuesto adicional de rentas internas de "cincuenta (50) centavos sobre cada millar de cigarrillos que se introduzcan, fabriquen, vendan o consuman en Puerto Rico." Los ingresos derivados de esa contribución debían ser usados para establecer un fondo especial dedicado a reintegrar a los municipios y a la Universidad las sumas correspondientes, debiendo dedicarse el sobrante a engrosar el "Fondo de Beneficencia Hospitalaria", para sostenimiento y equipo de los hospitales de distrito.

Alega la corporación demandante, que de acuerdo con las disposiciones de la citada ley, el Tesorero demandado le exigió que comprara y adhiriera a los cigarrillos por ella fabricados o vendidos los sellos de rentas internas correspondientes; que ante la amenaza de verse expuesta a denuncias y acusaciones y a sufrir las penalidades prescritas por la Ley de Rentas Internas, la demandante compró y pagó bajo protesta sellos de rentas internas por un total de $219,998.10, durante el período de octubre 29, 1940 a julio 14 de 1941. De la suma total así pagada por la demandante, $31,428.30 corresponden a sellos cancelados en pago de la contribución adicional impuesta por virtud de la citada Ley núm. 22 de 1939, sobre 62,856,600 cigarrillos fabricados por la demandante.

Sostiene la demandante que la contribución así impuesta y cobrada por el Tesorero es inválida, nula e ilegal por haber sido impuesta para un fin contrario a la ley, "ultra vires" de las funciones y poderes de la Legislatura y por ser contraria a la Ley Orgánica de Puerto Rico y a la Constitución de los Estados Unidos. Como causas específicas de nulidad se alegan las siguientes:

A. Violación del párrafo primero, artículo 2 de la Ley Orgánica y la Enmienda Catorce de la Constitución, porque establece un discrimen en favor de los contribuyentes morosos y en contra de los contribuyentes cumplidores que pagaron a tiempo sus contribuciones, negando así a estos últimos la protección igual de las leyes.

B. Infracción del párrafo 22 del mismo artículo 2 de la Ley Orgánica que dispone que "las leyes para la imposición de contribuciones en Puerto Rico serán uniformes."

C. Infracción del artículo 3 de la Ley Orgánica, que sólo autoriza la imposición de contribuciones sobre rentas internas "cuando dichas contribuciones sean para los fines de los gobiernos insular y municipales, respectivamente", por cuanto la contribución en controversia no ha sido impuesta para ningún fin legítimo de dichos gobiernos y sí para beneficiar ilegalmente a los contribuyentes morosos.

D. Se priva a la demandante de su propiedad sin el debido proceso de ley y negándole la protección igual de las leyes, al obligarla a desprenderse de sus fondos para beneficio y enriquecimiento injusto de los contribuyentes morosos.

E. El empréstito, cuya amortización constituyó el fin especial de la contribución no ha sido aun contratado ni jamás podrá ser contratado por motivo de la nulidad e ilegalidad de la ley que lo autoriza.

Con posterioridad a la radicación de la demanda original, la demandante radicó diecisiete demandas complementarias en las cuales reclamó la devolución de otras cantidades pagadas bajo protesta por concepto del mismo arbitrio. La suma total reclamada asciende a $93,366.44.

No existiendo controversia en cuanto a los hechos, el caso fué sometido por estipulación. En 29 de junio de 1942 la corte inferior dictó sentencia a favor de la demandante por la suma de $59,524.50 con intereses al 6 por ciento anual; y en noviembre 4 de 1942 dictó una sentencia complementaria por la suma de $33,841.75, que es la suma total reclamada en las demandas complementarias desde la décima a la décimoséptima, ambas inclusive, también con intereses al 6 por ciento anual. No conforme con dichas sentencias, el Tesorero demandado interpuso el presente recurso.

Por primera vez, en su alegato, el apelante ha levantado como "cuestión preliminar" la siguiente:

Después de haber sido dictadas y notificadas al Tesorero las dos sentencias recurridas, la legislatura aprobó la ley núm. 22 de 3 de diciembre de 1942 ((2) pág. 115), la cual había de comenzar a regir en marzo 3 de 1943. Las disposiciones de dicha ley, que consideramos esenciales y que son pertinentes al caso que hemos de resolver, son las siguientes:

1. Se impone una contribución adicional de rentas internas de cincuenta centavos sobre cada millar de cigarrillos que se introduzcan, fabriquen, vendan, usen o consuman en Puerto Rico.

2. Los fondos recaudados a virtud de dicha contribución serán ingresados en los fondos generales del Tesoro Insular.

3. La Ley núm. 22 de junio 18, 1939, enmendada por la núm. 149 de mayo 6 de 1940, que es la ley declarada inconstitucional por las sentencias objeto de este recurso, queda derogada.

4. Los efectos y disposiciones de la nueva ley se retrotraen al día 18 de junio de 1939, sin ninguna limitación. Desde esa fecha el Tesorero podrá cobrar la contribución adicional.

5. El Tesorero no devolverá las cantidades cobradas por virtud de la Ley núm. 22 de 18 de junio de 1939, enmendada por la núm. 149 de mayo 6, 1940, y dedicará las sumas así cobradas al pago de la contribución impuesta por la nueva ley.

Sin citar autoridad alguna en apoyo de su contención, sostiene el apelante que la derogación de la ley que dió origen a este pleito y el efecto retroactivo que se ha dado a la nueva ley, hacen que la demanda sobre devolución de contribuciones no tenga ya razón de ser y que la sentencia a favor de la demandante resulte académica por ampararse en una ley inexistente y no poder ser ejecutada. Alega, además, que el Tesorero no podría cumplir con el mandato de esta Corte Suprema, porque la nueva ley le ordena que se abstenga de devolver las cantidades cobradas y le manda aplicar esas sumas al pago de la contribución impuesta por la nueva ley.

Argumentando en contra de la cuestión preliminar así planteada, la demandante apelada sostiene:

1. Que la Ley núm. 22 de 1942 no es ni puede ser considerada como un estatuto curativo de otro o de convalidación o ratificación de actos ejecutados a virtud de otro estatuto anterior, (a) porque el texto de dicha ley no dispone ni expresa ni implícitamente que su propósito sea el de corregir, curar, subsanar, convalidar, rectificar, aclarar o ratificar la Ley núm. 22 de 1939; (b) porque la nueva ley deroga expresamente la anterior y ello con carácter retroactivo al mismo día en que ésta fuera aprobada, no pudiendo concebirse que un estatuto que ha dejado de existir pueda ser convalidado; y (c) porque no estando autorizada la Legislatura para aprobar la Ley núm. 22 de 1939, en su forma original, tampoco lo está para convalidarla o ratificarla a posteriori.

2. Que la Legislatura Insular no tiene facultad para imponer un arbitrio sobre la fabricación o ventas de cigarrillos consumidas más de tres años y medio antes de la aprobación de la ley.

3. La Ley núm. 22 de 3 de diciembre de 1942, en cuanto ordena al Tesorero que no devuelva cantidad alguna cobrada a virtud de la ley declarada nula por las sentencias recurridas, afecta los derechos adquiridos por la demandante por virtud de dichas sentencias y constituye una invasión injus-

tificada del poder legislativo de las funciones del poder judicial.

■ La primera cuestión que debemos resolver es: ¿Asumiendo que la Ley núm. 22 de 1939 adolece de los defectos señalados por la demandante, estuvo facultada la Legislatura para subsanarlos y para convalidar los cobros practicados bajo su amparo, mediante legislación de carácter retroactivo? Examinemos la jurisprudencia sometida por la apelada para sostener la negativa.

En *United States* v. *Heinszen & Co.*, 206 U. S. 370, 51 L. E. 1098, el Congreso Nacional aprobó en 1906 una ley por virtud de la cual se legalizaba y ratificaba el cobro de derechos de aduana por las autoridades federales en las Filipinas con anterioridad a marzo 8, 1902, "tan plenamente para todos los fines y propósitos como si los mismos hubiesen sido específicamente autorizados y ordenados por una ley anterior del Congreso". La Corte Suprema Federal sostuvo la validez del estatuto expresándose así:

"Que cuando un agente, sin autorización previa, ha hecho uso, en nombre de un principal, de una facultad que el principal tenía capacidad para conferirle, el principal puede ratificar y confirmar el acto desautorizado, y así retroactivamente darle validez cuando no hay de por medio derechos de terceros, es principio tan elemental que basta con sólo enunciarlo. Que el poder de ratificación en cuanto a asuntos dentro de sus facultades puede ser ejercitado por el Congreso, gobiernos estatales y corporaciones municipales, es también elemental."

\* \* \* \* \* \* \*

"En verdad, la contención va aún más lejos, puesto que no toma en absoluto en consideración el hecho importante de que aún cuando los derechos fueron cobrados ilegalmente, la ilegalidad no era el resultado de una inherente falta de poder en los Estados Unidos para haber autorizado la imposición de los derechos, sino que resultaba simplemente del hecho de haber dejado de delegar al funcionario la facultad esencial para dar validez inmediata a su conducta al exigir el pago de los derechos."

La decisión del caso de *Heinszen* se basa enteramente en la aplicación de la máxima legal "Omnis ratihabitio retrotrahitur et mandato priori acquiparatur". El Congreso pudo ratificar y convalidar la imposición de derechos hecha por orden y bajo la autorización del Presidente de los Estados Unidos, porque el Congreso tenía la facultad inherente necesaria para haber conferido originalmente al Presidente la facultad de imponer esos derechos. En *Rafferty* v. *Smith, Bell & Co.*, 257 U. S. 226, 66 L. Ed. 208 se confirmó la decisión en el caso de *Heinszen* y se resolvió que el hecho de que se hubiese obtenido una sentencia ante la Corte Suprema de Filipinas ordenando la devolución de derechos ilegalmente cobrados, antes de la aprobación de la ley del Congreso convalidando el cobro, no impedía el que dicha sentencia fuera revocada por la Corte Suprema Federal. *Véase: Hodges* v. *Snyder*, 261 U. S. 600.

En *Charlotte Harbor & N. Ry. Co.* v. *Wells*, 260 U. S. 8, 67 L. Ed. 100, la Corte Suprema sostuvo que la legislatura del Estado de Florida tenía facultad para aprobar una ley para convalidar las actuaciones de los Comisionados de Condados y "para legalizar y convalidar las contribuciones impuestas para la construcción de caminos y puentes", y se expresó así:

"La proposición generalmente establecida es que lo que la legislatura pudo haber autorizado lo puede ratificar, si puede autorizarlo en la fecha de la ratificación. (Citas) Y esa facultad es necesaria para que el gobierno no pueda ser derrotado por omisiones o inexactitudes en el ejercicio de funciones necesarias para su administración."

Si aplicamos la doctrina sentada por la jurisprudencia que acabamos de examinar al presente caso, tendremos que llegar a la conclusión de que si la Legislatura no estaba legalmente facultada para aprobar la Ley núm. 22 de junio 18 de 1939, por ser dicha ley contraria a las disposiciones y prohibiciones constitucionales, tampoco lo estaba para ratificar

dicha ley y los actos bajo ella realizados. Resolvemos por lo tanto que la Ley núm. 22 de diciembre 3 de 1942 no es ni puede ser considerada como una convalidación o ratificación legal de las contribuciones cobradas a la demandante bajo la ley de 1939.

No tenemos duda alguna en cuanto a que si la Legislatura hubiese tenido en 1939 y en 1942 la facultad necesaria para aprobar una ley para los fines y propósitos de la Ley núm. 22 de 1939, la ratificación de dicha ley en 1942 convalidaría retroactivamente la imposición y cobro de las contribuciones reclamadas por la demandante, aún después de haberse dictado sentencia ordenando la devolución de lo cobrado. Véase *Pillich* v. *Fitzsimmons, Auditor,* 59 D.P.R. 105.

Aceptando como debemos aceptar que la legislatura tiene facultad para imponer contribuciones de rentas internas a los cigarrillos, prospectivamente, o sea a los que se manufacturen con posterioridad a la aprobación de la ley, nos toca ahora considerar y resolver la segunda cuestión planteada por la apelada: ¿Está facultada la legislatura para imponer un arbitrio sobre cigarrillos fabricados o vendidos más de tres años y medio antes de la aprobación de la ley?

En sus Comentarios a la Constitución, Story se expresó así: "Las leyes retroactivas son, en verdad, generalmente injustas; y, según se ha dicho enfáticamente, no están de acuerdo con la sana legislación ni con los principios fundamentales del compacto Social." Story, Const. sec. 1398.

En *Shwab* v. *Doyle,* 258 U. S. 529, 66 L. Ed. 747, se trataba de la aplicación de una Ley del Congreso que imponía una contribución a los traspasos de bienes hechos por una persona dentro de los dos años precedentes a la fecha de su muerte. Augusta Dickel transfirió sus bienes "in trust" en abril 21, 1915 y falleció en septiembre 16, 1916. La ley del Congreso fué aprobada en septiembre 8, 1916. La Corte Suprema resolvió que el gobierno no tenía derecho a aplicar el estatuto

retroactivamente a una transferencia consumada con anterioridad a la fecha de su aprobación.

En *Levy* v. *Wardell*, 258 U. S. 542, 66 L. Ed. 758, se trató de imponer contribución a ciertas transferencias de acciones hechas años antes de la aprobación de la Ley de septiembre 8, 1916. La Corte Suprema falló a favor del demandante, diciendo:

"En la fecha en que se hicieron las transferencias no había ley alguna del estado de California que impusiera contribuciones sobre las transferencias o sobre las herencias, ni tampoco había ley alguna del Congreso a ese efecto, y todas las transferencias fueron hechas con la intención de que tuvieran efecto en cuanto a la posesión y al disfrute en la fecha de su otorgamiento. La ley del Congreso, por lo tanto, no debe ser interpretada retroactivamente, y, si así lo fuere, sería una violación de la Constitución de los Estados Unidos, por cuanto privaría a los demandantes de su propiedad sin el debido proceso de ley, infringiendo así la Enmienda 5ta. y, además, no sería una contribución sobre transferencias o una contribución indirecta, y sí una contribución directa sobre las mismas, en violación del artículo 1ro., párrafo 9, sub. 4 de la misma Constitución, por no haber sido impuesta con la debida relación al censo o enumeración, según lo que allí se dispone."

Véase, al mismo efecto, *Lewellyn* v. *Frick,* 268 U. S. 238, 69 L. Ed. 934; *Nichols* v. *Coolidge,* 274 U. S. 531, 71 L. Ed. 1185; *Blodgett* v. *Holden,* 275 U. S. 142, 72 L. Ed. 206; *Untermyer* v. *Andersen,* 276 U. S. 440, 72 L. Ed. 645; *Coolidge* v. *Long,* 282 U. S. 582, 75 L. Ed. 562; *Forbes Pioneer Boat Line* v. *Board of Commissioners,* 258 U. S. 338, 66 L. Ed. 647; *Danzer & Co.* v. *Gulf & Ship Island R. R. Co.,* 268 U. S. 633, 69 L. Ed. 1126; *Coombes* v. *Getz,* 285 U. S. 434, 76 L. Ed. 866.

De acuerdo con la doctrina sentada por la jurisprudencia que hemos citado es forzoso llegar a la conclusión de que la aplicación de la Ley núm. 22 de diciembre 3, 1942 a la manufactura y ventas de cigarrillos consumadas antes de la aprobación de dicha ley equivaldría a privar a la demandante

de su propiedad sin el debido proceso de ley, en violación de sus derechos constitucionales. Véase Anotación, 146 A. L. R. 1011.

La Ley núm. 22 de diciembre 3 de 1942 es también nula e inconstitucional en cuanto ordena (artículo 4) al Tesorero de Puerto Rico que no devuelva las sumas por él cobradas bajo la Ley núm. 22 de junio 18 de 1939, según fué enmendada en 1940, y que aplique esas sumas al pago de las contribuciones sobre ventas realizadas antes de la aprobación de la nueva ley. Las disposiciones del artículo 4 son en realidad un mandato al Tesorero de Puerto Rico para que ignore y se niegue a respetar y cumplir las sentencias dictadas por la Corte de Distrito de San Juan declarando ilegal el cobro de dichas contribuciones y ordenando la devolución de las sumas pagadas bajo protesta.

Es doctrina firmemente establecida por la jurisprudencia federal y por la de numerosas jurisdicciones estatales, que la legislatura no está facultada para invadir el campo de acción del poder judicial, dejando sin efecto, modificando o menoscabando una sentencia final dictada por una corte con jurisdicción para dictarla. Se basa esa doctrina en la necesidad imperiosa de mantener intacto el principio constitucional que requiere la separación de los tres poderes en que se divide todo gobierno democrático, pues como bien dice Montesquieu (The Spirit of Laws, Book XI, párrafo 6) "cuando los poderes legislativo y ejecutivo se unen en una misma persona, o en un mismo grupo de magistrados, no puede existir la libertad; porque pueden surgir aprensiones por el temor de que el mismo Monarca o Senado aprobara leyes tiránicas, para aplicarlas tiránicamente. Más aún, no existe la libertad, si el poder judicial no está separado del legislativo y del ejecutivo. Si estuviere unido al legislativo, la vida y la libertad del ciudadano estarían expuestas a un control arbitrario, porque el juez sería entonces el legislador.''

En *McCullough* v. *Commonwealth of Virginia*, 172 U. S. 102, 43 L. Ed. 382, la Corte Suprema, considerando la validez de un estatuto aprobado con posterioridad a la fecha de una sentencia e invocado en su contra, se expresó así:

"No figura entre los poderes de una legislatura el de anular derechos ya adquiridos por virtud de una sentencia. La legislación puede actuar sobre procedimientos subsiguientes, puede anular acciones pendientes, pero cuando esas acciones han sido resueltas por una sentencia el poder de la legislatura para alterar los derechos por esa sentencia creados cesa. Por eso, correctamente, la Corte de Apelaciones, al considerar la cuestión sobre la validez de esta sentencia, no tomó en consideración la posterior derogación de la ley bajo la cual se obtuvo la sentencia, y la investigación ante esta Corte no es en cuanto al efecto que la ley derogatoria de 1894 haya podido tener sobre los procedimientos iniciados con posterioridad, o pendientes en esa fecha, y sí en cuanto a si la derogación privó al demandante que obtuvo sentencia a su favor de los derechos adquiridos a virtud de dicha sentencia. Y en cuanto a ese respecto no tenemos dudas de que los derechos adquiridos por la sentencia bajo la ley de 1882 no fueron alterados por la derogación posterior del estatuto."

El Juez Cooley, en su obra "Constitutional Limitations" (8va. Ed., Vol. 1, 190 et seq.) trata esta interesante cuestión en los siguientes términos:

"Pero la acción legislativa no puede retrotraerse a pasadas controversias, ni puede tener el efecto de revocar decisiones dictadas por las cortes en el ejercicio de su indubitada autoridad; porque esto sería no solamente el ejercicio del poder judicial si que también su ejercicio en la forma más ofensiva y digna de oposición, toda vez que la legislatura estaría en efecto actuando como una corte de apelación a la cual las partes podrían recurrir cuando no estuvieren conformes con las decisiones de los tribunales.

"Así como la legislatura no puede dejar sin efecto la interpretación dada a la ley por las cortes en casos actuales, tampoco puede obligar a las cortes a que adopten una determinada interpretación de una ley que la legislatura permite quede en vigor. Declarar lo que es la ley o lo que ha sido es una facultad judicial; declarar lo que la ley será es legislativa. Uno de los principios fundamenta-

les de todos nuestros gobiernos es que el poder legislativo debe estar separado del judicial.''

Como autoridades sobre la materia véanse: *People ex rel Lafferty* v. *Owen,* 286 Ill. 638, 122 N. E. 132; Monografía 3 A. L. R. 450; *U. S.* v. *Judge Peters,* 5 Cranch 115, 3 L. Ed. 53–61; *U. S.* v. *Klein,* 80 U. S. 13 Wall. 128, 20 L. Ed. 519; *Langever* v. *Miller* (Tex) 76 S. W. (2d) 1025, 96 A. L. R. 836.

Hechos muy similares a los del caso de autos son los de *People ex rel Leaf* v. *Orvis,* 374 Ill. 536, 132 A.L.R. 1382. La legislatura de Illinois aprobó una ley autorizando una emisión de bonos e imponiendo una contribución para su pago. Una corte del estado declaró que tanto los bonos como la contribución eran nulos e inconstitucionales. Después de dictada esa sentencia, la legislatura aprobó una ley con la intención de convalidar la ley anulada y por ende dejar sin efecto la sentencia. Al resolver que la nueva ley constituía una invasión por la legislatura del poder judicial, dijo:

''Es uno de los principios fundamentales de nuestro gobierno que el poder legislativo se mantenga separado del judicial. Si la Asamblea General deseare prescribir para el futuro una regla distinta a las que las cortes aplican, debe hacerlo mediante estatuto aplicable en el futuro, y no puede hacerlo revocando las sentencias finales de los tribunales.

\* \* \* \* \* \* \*

''En el caso ante nos no ha habido defecto alguno, en cuanto a·procedimiento, en la emisión de los bonos o en la concesión de estas reclamaciones, sino que los bonos y las reclamaciones por las cuales fueron emitidos eran inválidos por carecer de facultad el distrito escolar para incurrir en esas obligaciones. Así lo sostuvo esta Corte, y por virtud de esa sentencia dichos bonos y reclamaciones quedaron fuera del alcance del poder de la legislatura para convalidarlos. La contribución aquí impugnada se cobra para pagar esos bonos inválidos.''

El caso de autos presenta una situación más fuerte y menos defendible que la del que acabamos de citar. No se

intenta siquiera convalidar la ley 22 de 1939. Todo lo contrario, dicha ley fué expresamente derogada, dejando como único y evidente propósito de la nueva ley el de permitir al Tesoro Insular retener para sí las sumas cobradas a virtud de una ley que ya había sido anulada y declarada inconstitucional por sentencia final de una corte competente.

Entre los casos citados por la parte apelada, ninguno se acerca tanto a la identidad con el de autos como el de *Forbes Pioneer Boat Line* v. *Board of Commissioners*, 258 U. S. 338, 66 L. Ed. 647. Se trataba de una reclamación de arbitrios o derechos cobrados ilegalmente a la demandante por una Junta que no tenía poder para imponerlos. El mismo día en que la Corte Suprema de Florida dictó sentencia sosteniendo la suficiencia de la demanda y devolviendo el caso a la corte inferior para ulteriores procedimientos, la legislatura aprobó una ley enmendando las ya existentes y confiriendo poder expreso a la Junta para imponer y cobrar arbitrios por el uso de los canales y exclusas. Se disponía en la nueva ley que todos los arbitrios previamente cobrados quedaban convalidados y legalizados. La Corte Suprema de Florida sostuvo que la ley enmendatoria era válida y constitucional, y apelado el caso a la Corte Suprema Federal, ésta revocó la sentencia. De la opinión, emitida por el Juez Holmes, copiamos lo que sigue:

"Desprovista de frases conciliatorias, la cuestión es si la legislatura de un estado puede despojar a una persona privada de su derecho a recobrar dinero que se le adeuda en el momento en que la ley es aprobada.     .          .          .          .          .          .

"Es cierto que la doctrina de ratificación ha sido llevada más allá del punto indicado, con referencia a actos ejecutados en nombre del gobierno por aquellos que asumen su representación. (Citas). Es también cierto que cuando se alegan derechos basados en un ligero defecto técnico . . . . las cortes han permitido que esos derechos sean anulados por legislación posterior (Citas). En esos casos se ha sugerido que la razón para ello es simplemente que los principios constitucionales deben dejarle alguna libertad a las junturas de la máquina.

"Pero las cortes no pueden ir muy lejos en contra del significado literal y clara intención de la regla constitucional. El demandado adeudaba al demandante una determinada suma de dinero que había obtenido de él mediante extorsión y sin derecho alguno. Se hace muy duro encontrar fundamento alguno para decir que la promesa de que la fuerza pública estará a disposición del demandante es menos absoluta de lo que es cuando se trata de una reclamación por la venta de mercancías. Sin embargo, nadie diría que una reclamación por mercancías vendidas puede ser abolida sin compensación. De la primera decisión de la corte inferior parece desprenderse que la transacción no era una por la cual debía naturalmente esperarse el pago. Decir que la legislatura simplemente estaba tratando de establecer una situación tal como la que ambas partes sabían desde el principio que así debería haber sido, sería poner algo así como un barniz sobre los hechos. Debemos asumir que el demandante viajó por el canal confiando en sus derechos legales, y no debe privársele de esos derechos porque la legislatura se olvidó."

La cuestión preliminar planteada por la parte apelante debe ser resuelta en su contra.

■■ Consideremos ahora los dos alegados errores señalados por el Tesorero apelante.

1. ¿Erró la corte inferior al declarar que la Ley núm. 22 de 18 de junio de 1939, enmendada en 1940, es anticonstitucional?

No se necesita gran esfuerzo para descubrir el arbitrario e injustificado discrimen que las cuatro primeras secciones de dicha ley establecen en favor de los contribuyentes morosos y en contra de los que pagaron a tiempo e íntegramente las contribuciones impuestas a sus propiedades. A los primeros, a los morosos, a los que no pagaron porque no quisieron o no pudieron, sin siquiera investigar las causas de su morosidad se les hizo una donación de $400. Y así, bajo la anunciada política pública de conservar para todo hombre su suelo, su comercio o su industria, fomentar la agricultura y disminuir el desempleo, fué posible que muchos contribuyentes que pudieron haber pagado sus contribuciones a tiempo sin esfuerzo alguno y no las pagaron por negligencia propia

o por la del Gobierno al no apremiarles para que las pagasen, recibieran una dádiva de $400 como premio a su morosidad. Al contribuyente cumplidor, a aquel que pagó a tiempo, a ése, la ley no le concedió nada. Y así, bajo la misma anunciada política pública, se hizo posible que muchos contribuyentes, quienes para poder pagar a tiempo y salvar su hogar sacrificaron su comercio, su industria o su finca, se quedasen sin una protección igual a la que la ley impugnada dió a los contribuyentes morosos no pudientes. Si la ley hubiese hecho extensiva la condenación a todos los contribuyentes, tanto a los morosos como a los cumplidores, o por lo menos a aquellos que no pagaron porque no pudieron y a aquellos que para poder pagar hubieron de incurrir en deudas o sacrificios, la ley sería defendible por lo menos desde el punto de vista de una sana y humanitaria política administrativa. La ley tal y como ha sido redactada y aplicada es indefendible desde todos los puntos de vista.

La contención de la demandante de que la ley impugnada está en abierto conflicto con las disposiciones del párrafo primero del artículo 2 de la Ley Orgánica y de la Enmienda XIV de la Constitución Federal, que garantizan a toda persona la protección igual de las leyes, está sostenida por numerosa jurisprudencia, interpretativa de la Enmienda XIV, que contiene igual prohibición que la de nuestra Carta Orgánica. En la mayoría de las jurisdicciones en donde se ha levantado esta cuestión, se ha sostenido que la remisión, condonación o transacción de una reclamación por contribuciones, autorizada por la legislatura, viola alguna disposición constitucional. *State ex rel. Matteson* v. *Luscke,* 99 A.L.R. 1053; *Wilson* v. *Sup. of Sutter So.,* 47 Cal. 91.

En *Simpson* v. *Warren,* (Fla., 1932) 143 So. 602, se dijo:

"Cuando un estatuto que provee para el cobro de una determinada contribución es válido y de acuerdo con sus disposiciones se han cobrado contribuciones a algunas personas, la Legislatura carece de poder para establecer un discrimen anticonstitucional contra, y negar la protección igual de las leyes a, aquellos contribuyentes

que ya han pagado la contribución mientras el estatuto estaba en vigor, condonando o borrando, arbitrariamente, mediante la derogación del estatuto o en alguna otra forma, la responsabilidad de aquellos que por su morosidad evadieron o pospusieron el pago. . . .''

En el caso de *Matteson* v. *Luscke,* supra, resuelto por la Corte Suprema de Minnesota, la cuestión envuelta era la constitucionalidad de una ley que concedía a los contribuyentes morosos el derecho a saldar sus deudas contributivas mediante el pago de una parte de las mismas. He aquí como se expresó el tribunal:

''Es para nosotros claro que el estatuto que estamos considerando infringe las disposiciones de nuestra Constitución. La clasificación de materias que se ha intentado hacer es irrazonable y fantástica. Los dueños de bienes inmuebles se dividen en dos clases: los que pagan las contribuciones puntualmente y los que no las pagan. Estos últimos pagan una cantidad menor que los primeros. Ninguna base razonable, fundada en diferencias esenciales de naturaleza o de circunstancias se han sugerido en pro de esta clasificación. Al determinar la razonabilidad de una clasificación establecida por la Legislatura, la corte no se preocupará por la cuestión de la política pública envuelta, ni por la conveniencia de la medida (citas). Sin embargo, al determinar la razonabilidad de una clasificación, es legítimo objeto de consideración por la corte el efecto práctico que la clasificación habrá de tener necesariamente sobre los negocios y sobre la sociedad organizada en general. Sobre este particular podrá verse en seguida que el estatuto que estamos considerando alienta y promueve la morosidad contributiva en el estado. Se induce a los contribuyentes a dejar de pagar a tiempo las contribuciones, para poder satisfacerlas totalmente en el futuro mediante el pago de una fracción de la suma originalmente impuesta. Tal resultado no es deseable, y demuestra cuan falta de razón es la clasificación.''

Véanse, al mismo efecto, *Richey* v. *Wells,* (Fla. 1936) 166 So. 817; *State* v. *Hunt,* (Ohio 1937) 9 N. E. (2d) 676; *Steinacher* v. *Swanson,* (Neb. 1936) 268 N. W. 317 y *State ex rel* v. *Fischl,* (Mont. 1933) 20 Pac. (2d) 1057.

Convenimos con la demandante y con la corte inferior en que la ley impugnada transciende los límites de las disposiciones de la Ley Orgánica y de la Constitución Federal que

garantizan a toda persona la protección igual de las leyes, y que infringe también las disposiciones de la Ley Orgánica que requieren uniformidad en la imposición de contribuciones.

También aceptamos como bien fundada la decisión de la corte inferior en cuanto a que la ley impugnada debe ser declarada nula e inconstitucional en su integridad y que no es posible sostener que es inválida en cuanto a la condonación de las contribuciones y válida en cuanto a la imposición del arbitrio sobre la manufactura y venta de cigarrillos. Cuando las diferentes disposiciones de una ley están tan íntimamente relacionadas unas con otras y dependen unas de otras, como sucede en el presente caso, la ley debe ser tratada como una integridad y como tal invalidada o sostenida. *Johnson* v. *State,* (N. J.) 38 L. R. A. 373, 37 Atl. 949; *Riccio* v. *Hoboken,* 63 L.R.A. 485; *Carter* v. *Carter Coal Co.,* 298 U. S. 238, 80 L. Ed. 1160; y *Williams* v. *Standard Oil Co.,* 278 U. S. 234, 73 L. Ed. 287.

2. El segundo error imputado a la corte sentenciadora es el de haber resuelto que la demandante tenía *status* o interés legal para incoar este pleito.

La frivolidad de este señalamiento es tan patente, que no creemos necesario darle tan extensa consideración como la que le diera el juez sentenciador en su hábil y bien razonada opinión.

Es un hecho admitido que la demandante no es uno de los contribuyentes que pagó las contribuciones sobre su propiedad y que no tuvo el beneficio de la condonación. Y si aplicáramos al caso la regla general de que un estatuto discriminatorio sólo puede ser atacado por aquéllos contra quienes se discrimina, tendríamos que sostener que el error imputado fué cometido. Empero, la regla general a que nos hemos referido tiene sus excepciones, siendo una de ellas la de que cuando la ley impugnada contiene disposiciones íntimamente ligadas e inseparables unas de otras, cualquier per-

sona afectada por una de esas disposiciones puede alegar la inconstitucionalidad de la ley, aún cuando no sea una de las personas directamente perjudicadas por el discrimen.

Resuelta en contra del apelante la cuestión principal, o sea que la ley impugnada es totalmente nula, ¿qué razón podríamos aducir para sostener que la demandante, a quien se obligó a pagar cerca de cien mil dólares que habían de ser dedicados al pago de un empréstito que nunca se contrató y que de haber sido contratado se hubiera dedicado a un propósito ilegal, no tiene *status* o interés legal para exigir la devolución de lo que se le cobró ilegalmente y pagó bajo protesta? Sería en verdad absurdo sostener que un contribuyente cumplidor que pagó a tiempo cinco dólares de contribución y no obtuvo el beneficio de la condonación, puede impugnar el estatuto; y que un fabricante de cigarrillos a quien se obligó a pagar cien mil dólares, para formar un fondo que habría de ser dedicado a cubrir los déficits causados por las condonaciones ilegales, no tiene ni interés ni *status* para pedir protección a los tribunales contra la exacción ilegal de que fué víctima. Véanse: *Shinn* v. *Oklahoma City,* 87 Pac. (2d) 136; 11 Am. Jur. 755; *Conard* v. *State,* 16 Atl. (2d) 121; *State* v. *Louisiana Coca-Cola Bottling Co.,* 124 So. 769; y *Federal Paving Corp.* v. *Prudisch* (Wis.) 293 N. W. 156.

Siendo inválido y contrario a los preceptos constitucionales el propósito fundamental de la ley, para el cual se impuso y cobró el arbitrio, el cobro de éste debe ser también declarado ilegal. Y habiendo sido pagado bajo protesta, la demandante tiene el interés y el *status* legal que se requiere para poder incoar la acción.

La ley impugnada es contraria a la Ley Orgánica y a la Constitución Federal por la razón adicional de que priva a la demandante de su propiedad sin el debido proceso de ley al imponerle una contribución para un fin privado y no para un fin público. Véanse: *Savings and Loan*

*Assn.* v. *Topeka,* 20 Wall. 655, 22 L. Ed. 455; Cooley on Taxation, Vol. 1, sec. 174; *Cole* v. *City of La Grange,* 113 U.S. 1, 28 L. Ed. 896; *U. S.* v. *Butler,* 297 U. S. 1, 80 L. Ed. 477.

*Por las razones expuestas, se confirman las sentencias recurridas.*

El Juez Asociado Sr. Snyder no intervino.