PORTO RICO TELEPHONE COMPANY, peticionaria, *v.* TRIBUNAL
DE CONTRIBUCIONES DE PUERTO RICO, demandado; HON.
SOL LUIS DESCARTES, SECRETARIO DE HACIENDA, interventor.

Números 295, 296 y 297.
*Reasignados:* 13 de octubre de 1959. *Resueltos:* 30 de junio de 1960.

*Franceschi & Sifre,* abogados de la peticionaria; *Hon. Secretario de Justicia Hiram R. Cancio (J. B. Fernández Badillo, ex-Secretario de Justicia Interino y J. C. Santiago Matos, Procurador Auxiliar,* en el alegato), abogados del interventor.

EL JUEZ ASOCIADO SEÑOR SERRANO GEYLS emitió la opinión del Tribunal.

En este recurso la peticionaria, Porto Rico Telephone Co., impugna la constitucionalidad de la sec. 2 de la Ley núm. 301 de 15 de mayo de 1945 (*Leyes,* pág. 1147; 27 L.P.R.A. sec. 342), la cual dispone lo siguiente:

"Por la presente se autoriza y ordena al Secretario de Hacienda para imponer y cobrar una contribución o impuesto de dos por ciento sobre el ingreso bruto de operación cobrado por

cualquier compañía de servicio público o instrumentalidad gubernamental del Estado Libre Asociado de Puerto Rico, por la trasmisión de mensajes telefónicos y telegráficos, incluyendo giros telegráficos. Toda cantidad recibida por el Secretario de Hacienda a virtud de las disposiciones de esta sección será depositada por él en un fondo especial que se denominará Fondo Especial para el Fomento de Comunicaciones. Dichos fondos serán puestos, de tiempo en tiempo, a la disposición de la Junta de Directores de la Autoridad de Comunicaciones de Puerto Rico, mediante su requerimiento para su inversión por dicha junta, o bajo sus órdenes, en aquellas mejoras, extensiones, investigaciones, experimentos e investigaciones especiales, que crea conveniente, con el fin de extender y mejorar la calidad del sistema y facilidades de las comunicaciones telefónicas y telegráficas en Puerto Rico. Dicho impuesto deberá ser pagado por las compañías de servicio público o por las instrumentalidades públicas que rindan dicho servicio, dentro de los sesenta (60) días después de haber cerrado la contabilidad de cada año económico; y bajo ningún concepto deberá cargarse el mismo a las personas que utilicen sus servicios."

La peticionaria interpuso demanda de reintegro ante el antiguo Tribunal de Contribuciones, el cual la denegó y sostuvo la validez de la disposición impugnada. En su extensa y hábil opinión, el tribunal de instancia consideró probados ciertos hechos que conviene exponer antes de analizar los problemas legales. Son los siguientes:

En los años a que se refiere el litigio existían en Puerto Rico (y todavía existen) dos organizaciones, una gubernamental y otra privada, que se dedicaban a ofrecer servicios telefónicos. La primera tiene el nombre de Autoridad de Comunicaciones de Puerto Rico y presta servicios a la ciudad de Caguas y otros nueve pueblos limítrofes. También administra un sistema telegráfico que cubre todo el país. La segunda, demandante en esta causa, funciona bajo el nombre de Porto Rico Telephone Company y ofrece el servicio en toda la isla, con excepción del área cubierta por la Autoridad. Los sistemas telefónicos de las dos organizaciones están interconectados por líneas de larga distancia. La Comisión de Ser-

vicio Público reglamenta los servicios y las tarifas de la demandante, pero no los de la Autoridad. Esta tiene completa libertad para fijar sus precios.

Tanto la Porto Rico Telephone Company como la Autoridad han pagado la contribución que impone la Ley núm. 301.(¹) Durante los años 1945, 1946 y 1947 la Autoridad solicitó y obtuvo dinero del fondo especial creado por esa ley "y con dicho dinero . . . ha mejorado la calidad del servicio telefónico en el área en que sirve, sustituyendo un sistema viejo y en ruinas que recibiera del Negociado del Telégrafo del Gobierno Insular por otro nuevo, además de haber aumentado y extendido su capacidad original, principalmente el sistema telefónico a Vieques y Culebra." La Autoridad ha recibido del fondo especial más cantidades de las que ella ha aportado al mismo, pero la mayor parte de los fondos utilizados en las mencionadas mejoras han sido asignados de fondos generales por la Asamblea Legislativa. La Autoridad no ha utilizado parte alguna de esos fondos para hacer "mejoras directas" en el sistema de la demandante. Esta "se beneficia de las mejoras hechas por la Autoridad en forma indirecta, o sea, a través de la interconexión o unificación de ambos servicios. El mejoramiento del servicio de la Autoridad ha resultado en beneficio para ambas entidades debido a dicha interconexión."

"La Autoridad ha sustituido el sistema que adquirió con uno nuevo automático y más eficiente en todos los pueblos que sirve. Se han extendido las comunicaciones telefónicas en la isla y hasta Vieques y Culebras y la calidad del servicio ha mejorado." Hasta 1947 había habido un aumento de 340 por ciento en el número de abonados de la Autoridad. "Las mejoras hechas por la Autoridad en su sistema telefónico han beneficiado al público en general, inclusive los abonados de la demandante; y benefician al gobierno."

(¹) La peticionaria pagó $18,850.59 en 1945, $34,693.88 en 1946 y $38,246.93 en 1947. La Autoridad pagó $6,000 en 1945 y cerca de $8,000 en los otros años.

Entre los años 1945 y 1947 la Porto Rico Telephone no solicitó ni obtuvo de la Comisión de Servicio Público un aumento en sus tarifas. En 1948 hizo una petición de aumento que luego retiró y luego hizo otra en 1949. En el año siguiente la Comisión autorizó un aumento.

"Las ganancias netas de operación de la demandante en el año 1944 fueron de $67,214; en 1945 $121,881; en 1946 $277,509; y en 1947 $281,019. A base de la inversión y de la planta, las anteriores ganancias netas representan un 2.4% en el año 1944, 2.61% en 1945, 4.39% en el 1946 y 4.10% en 1947." Tanto la contribución sobre ingresos como la especial de 2% de la Ley núm. 301 fueron tomadas en consideración en el cómputo de las mencionadas ganancias. Al conceder el aumento provisional en 1950, la Comisión de Servicio Público lo hizo a base del mínimo de 5 por ciento de ganancia que autorizaba la Ley núm. 12 de 9 de abril de 1941 (*Leyes*, pág. 343). El aumento en el ingreso bruto de la demandante durante los años mencionados se debió (1) al aumento en el número de teléfonos y (2) al desarrollo del servicio de larga distancia.

Durante los años anteriores al 1948 aumentaron continuamente los gastos de funcionamiento de la demandante. Una de las causas principales fue el alza en salarios y otras concesiones a los trabajadores que resultaron en un gasto de más de un millón y medio de dólares desde 1943 a 1948. "El gasto adicional causado por la contribución del 2 por ciento no fue la razón que indujo a la demandante a solicitar de la Comisión de Servicio Público el aumento en sus tarifas."

Frente a esa ley y esos hechos, la peticionaria aduce los siguientes fundamentos en apoyo de su solicitud de inconstitucionalidad: (1) La ley impugnada viola el art. 3 de la Carta Orgánica de Puerto Rico porque la contribución que impone no es "para los fines de los gobiernos insular y municipal". (2) La ley deja la inversión del impuesto al capricho de la Autoridad de Comunicaciones y constituye, por lo tanto, una indebida delegación de poderes legislativos. (3) La

contribución constituye una exacción forzosa de la propiedad de la peticionaria, so pretexto del poder contributivo. (4) La ley viola la regla de uniformidad y priva a la peticionaria de su propiedad sin el debido proceso de ley. (5) La ley es nula porque prohibe pasar la contribución al consumidor. Analizaremos cada una de esas alegaciones separadamente.

I. *"Fines de los gobiernos insular y municipal"*

■ La sec. 3 de la Carta Orgánica, vigente en los años a que se refiere este litigio, ([2]) dispone que . . . "podrán imponerse contribuciones e impuestos sobre la propiedad, ingresos, rentas internas, y por licencias, franquicias, privilegios y concesiones, *cuando dichas contribuciones sean para los fines de los gobiernos insular y municipal, respectivamente,* y se impongan según las disposiciones y prescripciones de la Asamblea Legislativa de Puerto Rico." (Énfasis suplido.)

A la luz de esa disposición, la peticionaria en síntesis sostiene que la frase "para los fines de los gobiernos insular y municipal" no es equivalente a la frase "para un fin público" que como parte del debido procedimiento de ley ([3]) define el poder de imponer tributos; que "una contribución significa una exacción para el mantenimiento del gobierno y para sostener aquellos servicios que son función lógica y natural del gobierno"; que el mejoramiento de las telecomunicaciones no es un "fin de gobierno"; y que la Autoridad de Comunicaciones no es parte del gobierno, ni ejerce una función de gobierno.

En apoyo de su interpretación restrictiva de la frase "para los fines de los gobiernos insular y municipal" la peticionaria nos cita trozos de opiniones judiciales en las cuales se discuten las conocidas doctrinas de inmunidad fiscal recíproca entre el

---

([2]) Esta disposición sigue vigente como parte de la "Ley de Relaciones Federales con Puerto Rico". 64 Stat. 320.

([3]) Además, en algunos estados se exige expresamente por disposición constitucional que las contribuciones sean para "un fin público". McAllister, *Public Purpose in Taxation,* 18 Cal.L.Rev. 137, 138 (1929). La Sección 9 del Artículo VI de la Constitución del Estado Libre Asociado de Puerto Rico, vigente desde 1952, provee que: "Sólo se dispondrá de las propiedades y fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado, y en todo caso por autoridad de ley."

gobierno federal y los estados y de inmunidad de los munici-
pios por daños causados en el ejercicio de sus funciones "gu-
bernativas", a diferencia de sus funciones "de propiedad".(⁴)
Independientemente de que ambas doctrinas vieron ya
hace tiempo sus mejores días, no hay duda de que son cla-
ramente inaplicables a la situación de este caso. La primera
se propone proteger la estabilidad del sistema federal norte-
americano y la autonomía de sus integrantes e impide que el
gobierno nacional y los estados se impongan mutuamente con-
tribuciones que debiliten o destruyan sus funciones. Esa
doctrina recorrió caminos muy accidentados y en los últimos
años se han corregido muchos de los extremos a que llevó su
aplicación inicial. *Phillips Chemical Co.* v. *Dumas School
District*, 4 L. ed. 2d 384 (1960); *United States* v. *City of
Detroit*, 355 U. S. 466 (1958); *United States* v. *Township of
Muskegon*, 355 U. S. 484 (1958); *City of Detroit* v. *Murray
Corp.*, 355 U. S. 489 (1958); Powell, *The Waning of Inter-
governmental Tax Immunities*, 58 Harv.L.Rev. 633 (1945).
La segunda constituye una de las maneras mediante las cua-
les los tribunales trataron de mitigar los duros efectos de la
doctrina de inmunidad del soberano en el campo de los actos
torticeros. Para esos fines se dividieron las funciones muni-

---

(⁴) Además de la mencionada jurisprudencia, la peticionaria se apoya
en dos otras líneas de precedentes. Nos cita, de una parte, sentencias dic-
tadas por algunos tribunales norteamericanos a principios de la segunda
mitad del siglo 19, cuando prevalecía un concepto muy estrecho de las fun-
ciones del gobierno y, por consiguiente, de lo que constituía un "fin público".
A esta clase pertenecen *Lowell* v. *City of Boston*, 15 Am. Rep. 39 (1873)
—una ciudad no puede emitir bonos para hacer préstamos a personas cuyos
hogares fueron destruidos por un incendio; *Weimer* v. *Village of Douglas*,
21 Am. Rep. 586 (1876)—un municipio no puede emitir bonos para com-
prar acciones en una corporación con el propósito de inducirla a estable-
cerse en dicho municipio; *Loan Association* v. *Topeka*, 87 U. S. 655 (1875)
—una ciudad no puede emitir bonos para ayudar a compañías manufacture-
ras a establecerse en la ciudad. Como se demostrará más adelante en esta
opinión, las determinaciones específicas de esos casos han sido abandonadas
desde hace varias décadas y su valor actual es principalmente histórico
De otra parte, la peticionaria nos cita sentencias—*State ex rel. City of Reno*
v. *Boyd*, 74 Pac. 654 (1903); *State* v. *Lafayette Fire Ins. Co.*, 63 So. 630
(1913); *Peterson* v. *Hancock*, 54 N.W.2d 85 (1952)—que decretan la nuli-

cipales en "gubernamentales" y de "propiedad", resolviéndose que al ejercer los municipios las segundas, no había buenas razones para oponerle la doctrina de inmunidad a los damnificados. *Gobierno de la Capital* v. *Consejo Ejecutivo*, 63 D.P.R. 434, 437–439 (1944); *Serra* v. *Autoridad de Transporte*, 67 D.P.R. 611 (1947); *Rodríguez* v. *Pueblo*, 75 D.P.R. 401, 412 (1953); Symposium—*Governmental Tort Liability*, 9 L. & Contemp. Prob. 179–370 (1942); *Municipal Corporations—Sovereign Immunity*, 11 Vand. L. Rev. 253 (1957).

Es evidente que esas distinciones obedecen a circunstancias jurídicas y sociales muy alejadas del problema que hoy confrontamos. La peticionaria no nos brinda ni hemos podido hallar razones de peso que justifiquen su uso como medida de los poderes de imponer tributos y de gastar los fondos públicos que el Congreso delegó en la Asamblea Legislativa de Puerto Rico. Sin duda, necesitaríamos mucho más que esas frágiles analogías para aherrojar la autoridad fiscal a los estrechos conceptos que nos suministra la peticionaria. Cf. *Puget Sound Co.* v. *Seattle*, 291 U. S. 619, 623–626 (1934).

■■ Es indispensable, por lo tanto, acudir a otras fuentes. El historial legislativo de la Carta Orgánica—53 *Congressional Record*, Partes 6–9; Congreso núm. 64, *House*

---

dad de una contribución impuesta por una ciudad o un distrito para el beneficio de otros distritos o ciudades. Esa jurisprudencia se funda en la fuerte tradición de autonomía municipal que existe en los Estados Unidos, y, por sus hechos, no tiene aplicación alguna al problema que hoy consideramos.

En repetidas ocasiones, la peticionaria también se apoya en *United States* v. *Butler*, 297 U. S. 1 (1936) el cual resolvió que era inconstitucional una contribución impuesta por el Congreso porque su producto iba a ser utilizado, no para un fin privado, sino como parte de un plan de reglamentación de la agricultura que el Tribunal Supremo federal consideró estaba fuera de los poderes delegados por la Constitución al gobierno federal. Aparte de que esta última determinación de *Butler* ha sido definitivamente descartada—*Sunshine Anthracite Coal Co.* v. *Adkins*, 310 U. S. 381 (1940); *Wickard* v. *Filburn*, 317 U. S. 111 (1942)—en el presente caso no se nos plantea el problema de si el producto de la contribución va a ser utilizado en apoyo de un plan de reglamentación fuera del ámbito de poder del gobierno de Puerto Rico, sino escuetamente si dicha contribución es o no para un "fin público", asunto éste que el Tribunal expresamente soslayó en *Butler*. 297 U. S. 68.

*Report* núm. 77 y *Senate Report* núm. 579—no contiene expresión específica alguna sobre la antedicha frase de la sec. 3. Demuestra palpablemente, sin embargo, que el Congreso se propuso delegar en el Gobierno de Puerto Rico poderes similares a los que poseían los estados de la Unión.

En varias ocasiones, el Tribunal Supremo federal ha sancionado esa norma de interpretación. Dijo en *Puerto Rico* v. *Shell Co.*, 302 U. S. 253, 261–262 (1937) :

"El propósito del Acta Foraker y el Acta Orgánica fue el de concederle a Puerto Rico completos poderes de autodeterminación local, con una autonomía parecida a las de los estados y los territorios incorporados. El resultado fue conferir al territorio muchos de los atributos de cuasi-soberanía poseídos por los estados—como por ejemplo inmunidad contra pleitos sin su consentimiento. Por medio de esas actas, se erigió la típica estructura gubernamental norteamericana que consiste de tres ramas independientes—legislativa, ejecutiva y judicial. Se creó un "cuerpo político"—una comunidad (commonwealth). El poder de imponer contribuciones, el poder de aprobar leyes y ponerlas en vigor, y otros poderes característicamente gubernamentales fueron concedidos. Y en lo que se refiere a asuntos locales, como hemos ya demostrado con relación a los territorios continentales, se otorgaron poderes legislativos casi tan extensos, aunque no totalmente, como los que ejercían las legislaturas estatales." (Se han eliminado las citas.) Véanse, además, *Puerto Rico* v. *Rubert Hnos.*, 309 U. S. 543, 547 (1940) ; Cf. *De Castro* v. *Board of Commissioners*, 322 U. S. 451 (1944) ; *Bonet* v. *Yabucoa Sugar Co.*, 306 U. S. 505 (1939) ; *Bonet* v. *Texas Co.*, 308 U. S. 463 (1940) ; *Domenech* v. *National City Bank*, 294 U. S. 199 (1935).

Nos parece absurdo aceptar que otra fuera la voluntad legislativa cuando se trata de un poder de las dimensiones y la importancia vital del de imponer tributos. Seguramente, el Congreso se propuso darle ese poder al gobierno de Puerto Rico, (⁵) sujeto a la norma general del "fin público" que limita

---

(⁵) La limitación que estamos analizando se incorporó a las actas orgánicas de otros territorios usándose palabras idénticas o muy similares. Islas Vírgenes—48 U.S.C. sec. 1406 *i*; Guam—48 U.S.C. sec. 1423 *a;* Islas Filipinas—39 Stat. 548; Alaska—48 U.S.C. sec. 79.

constitucionalmente tanto al gobierno federal(⁶) como a los de los estados. No hay razón alguna para creer que intentó encasacar al gobierno de Puerto Rico de tal manera que estuviese impedido de expender los fondos públicos en actividades que desde hace varias décadas constituyen lugares comunes en la experiencia federal y estatal. (⁶ᵃ) Un instrumento legal que define los poderes de un gobierno no puede interpretarse con ese espíritu de campanario.

Más de medio siglo(⁷) de práctica de gobierno confirma el propósito del Congreso. Desde 1900 hasta 1952, y particularmente en la última década de ese período, la Asamblea Legislativa de Puerto Rico autorizó contribuciones y erogaciones

---

(⁶) La limitación se impone al Congreso por vía de la cláusula de "bienestar general"—Artículo I, Sección 8, Cl. 1 de la Constitución de los Estados Unidos—y a los estados a través de la cláusula del "debido procedimiento" de la Enmienda XIV. Los principios aplicables, sin embargo, son similares.

(⁶ᵃ) Otras disposiciones de las dos actas orgánicas aclaran el propósito del Congreso. Foraker: sec. 4—todo el dinero recaudado en Puerto Rico por derechos y contribuciones con anterioridad a la vigencia de la ley, entrará en el Tesoro de Puerto Rico "destinado al Gobierno de la Isla y para ser invertido en provecho de la misma"; sec. 12—ordena al Tesorero pagar de fondos insulares "todos los gastos y obligaciones contraídos para mejoras internas o fomento de la Isla"; sec. 38—en los casos en que fuere necesario anticipar contribuciones y rentas se podrán emitir bonos" para proveer a gastos legítimos, proteger el crédito público, y reembolsar a los Estados Unidos por dinero gastado o que pueda gastarse del fondo de imprevistos del Departamento de la Guerra para socorrer la . . . situación industrial de Puerto Rico causada por el huracán . . ." Acta Orgánica (Jones) de 1917: art. 6—ordena al Tesorero pagar de fondos insulares "todos los gastos y obligaciones contraídos para mejoras internas o fomento de la Isla"; art. 18—"El Comisionado de Agricultura y Comercio tendrá a su cargo en general aquellos negociados y ramas del gobierno que hayan sido legalmente constituidos para el estudio, adelantamiento y beneficio de la agricultura, del comercio y de otras industrias . . ."

(⁷) La limitación que estamos discutiendo se incorporó originalmente en la sec. 38 del Acta Foraker de 1900. Hemos examinado el Vol. 33, Parte 4 del Congressional Record (1900) y el Senate Report núm. 249, Congreso núm. 56, sometido por el Senador Foraker, y tampoco hemos hallado explicación alguna sobre la citada disposición. No ha sido posible utilizar otras fuentes del historial legislativo de las dos actas orgánicas.

para los mil y un propósitos (⁸) que los gobiernos modernos se ven obligados a cumplir. Las leyes pertinentes fueron firmadas por gobernadores de nombramiento presidencial e informadas al Congreso de acuerdo con lo dispuesto en la sec. 23 de la Carta Orgánica, sin que en ningún momento se desaprobaran o ni tan siquiera se pusiera en duda el poder local para aprobarlas. En 1950 el Congreso, obviamente familiarizado con el desarrollo económico de Puerto Rico y la activa intervención de su gobierno en los procesos económicos, muchas veces mediante el desempeño de actividades de tipo industrial y comercial, mantuvo, con la aprobación de los electores puertorriqueños, exactamente la misma limitación en la "Ley de Relaciones Federales con Puerto Rico". Concluimos, a la luz del significado lógico y corriente de las palabras usadas, de la gravísima importancia del poder fiscal, de la intención del Congreso de dotar a Puerto Rico con poderes de gobierno similares a los de un estado, y de la práctica invariable de más

(⁸) Sería prolijo y es completamente innecesario enumerar todas las leyes que sostienen esta afirmación. Basta señalar que desde principios de siglo hasta los años a que se refiere el presente litigio, el Gobierno de Puerto Rico, aparte de desempeñar sus funciones clásicas, ha asignado fondos para numerosas otras. Una búsqueda al azar demuestra que el gobierno insular impuso contribuciones y asignó dinero para la venta de electricidad, de agua para riego, y de facilidades y servicios de muelles, y los municipios para acueductos, plantas eléctricas y algunos también para muelles. Se fomentó la actividad agrícola y ganadera por diversos medios—subsidios, escuelas, estaciones experimentales, campañas contra enfermedades, ferias, exposiciones, anuncios, etc.—estableciéndose para esos propósitos numerosos fondos separados que se nutrían de contribuciones especiales o de otras fuentes. La industria recibió también ayuda aunque en menor escala. También se legisló para programas de viviendas a bajo costo, variados servicios para las clases menesterosas y actividades de fomento cultural. Como es sabido, a partir de 1941 se intensificaron estas actividades y se añadieron otras. El gobierno asignó cuantiosas sumas para el fomento económico y participó directamente en la posesión y administración de empresas agrícolas, industriales y comerciales. Véanse como ejemplos salteados los siguientes tomos y páginas de las *Leyes de Puerto Rico:* 1903–34, 49; 1911–88, 167; 1912–83; 1913–149; 1914–165, 236; 1917–369; 1917 II-293; 1919–349; 1921–91; 1925–327; 1930–131; 1934–217, 273; 1936–543; 1937–230, 235, 243; 1938–194, 292, 413, 511; 1939–715; 1940–325, 727, 1145; 1941–389, 685, 763, 863, 935, 945; 1942–573, 711, 935, 1065, 1365; 1946–331, 1067.

de medio siglo, que la frase "para los fines de los gobiernos insular y municipal" de la sec. 3 de la Carta Orgánica no tiene un significado más estrecho que la frase "para un fin público", limitativa de los poderes del Congreso y los estados. Reafirmamos así lo que implícitamente habíamos resuelto en *Márquez & Cía.* v. *Tesorero,* 57 D.P.R. 322 (1940). (*Cf. P. R. Distilling Co.* v. *Sancho Bonet,* 52 D.P.R. 672, 679 (1938); *P. R. Tobacco Corp.* v. *Buscaglia,* 62 D.P.R. 811, 830 (1944).)

Pasamos, por consiguiente, a considerar si los propósitos legislativos expresados en la sec. 2 de la Ley núm. 301—"inversión . . . . en . . . . mejoras, extensiones, investigaciones, experimentos e investigaciones especiales . . . . con el fin de extender y mejorar la calidad del sistema y facilidades de las comunicaciones telefónicas y telegráficas en Puerto Rico"—constituyen un "fin público".(⁹) Antes de fallar sobre este problema específico es indispensable, sin embargo, mencionar algunos principios que le sirven de trasfondo.

*Primero:* Considerada por sí sola la contribución que hoy se impugna es perfectamente válida. La objeción en su contra surge del hecho de que la ley que la impone al mismo tiempo la destina a un propósito específico, en vez de ordenar su ingreso en los fondos generales del gobierno. Esa circunstancia concede a quien la paga una facultad especial (standing) para impugnar la constitucionalidad de la erogación, y en consecuencia la del tributo, que de otro modo y como parte del cuerpo general de contribuyentes no tendría. *United States* v. *Butler,* 297 U. S. 1, 57–58 (1936); *Massachusetts* v. *Mellon,* 262 U. S. 447 (1923); *Suárez* v. *Tugwell,* 67 D.P.R. 180 (1947); *Cafeteros de Puerto Rico* v. *Tesorero,* 74 D.P.R. 752 (1953). "Pero si la contribución, *qua* contribución, fuere válida . . . . y el propósito especificado fuere uno que sostendría una asignación subsiguiente y separada hecha de los fondos

---

(⁹) Sobre lo que constituye un "fin público" véanse, en general, Judson, *Public Purposes for Which Taxation is Justifiable,* 17 Yale L. J. 162 (1908); McAllister, *ob. cit.,* supra; Bergman, *The Federal Power to Tax and to Spend,* 31 Minn. L. Rev. 328 (1947).

generales del Tesoro, ninguno de los dos sería nulo por estar unido al otro en la misma pieza de legislación. La única preocupación que tenemos en cuanto a este aspecto del caso es la de determinar si el Congreso puede, sin violar la ley fundamental, hacer una asignación para el propósito especificado. Si el Congreso, por razones que consideró satisfactorias, decidió adoptar el *quantum* de ingresos de esta contribución especial como medida de la asignación, no hallamos fundamento válido alguno para atacar su poder de así hacerlo." *Cincinnati Soap Co.* v. *United States*, 301 U. S. 308, 313 (1937); Bergman, *ob. cit.*, págs. 350–353.

*Segundo:* Es extremadamente reducida la función judicial de revisar las determinaciones legislativas sobre lo que constituye un "fin público" en la imposición de tributos.[10] A los criterios usuales de autolimitación que guían la "grave y delicada función" judicial de juzgar la validez constitucional de las medidas legislativas—*E.L.A.* v. *Aguayo*, 80 D.P.R. 552, 595–597 (1958)—se une en este caso la especial circunstancia de que la determinación del legislador tiene por base variados elementos de la política pública cuyo escrutinio está fuera de la competencia de los jueces. La aprobación de una medida contributiva requiere el estudio detenido de difíciles problemas políticos, sociales y administrativos, y, sobre todo, pesar el efecto económico de la nueva imposición sobre el consumo, las inversiones, la producción, el empleo, el ingreso y el ahorro. Se explica así la reiterada renuencia de los tribunales a intervenir activamente en este asunto.

En repetidas ocasiones el Tribunal Supremo federal ha fijado la profundidad de las incursiones judiciales en esta área. En *Carmichael* v. *Southern Coal Co.*, 301 U. S. 495, 514–515 (1937) el Tribunal explicó que desde la adopción de la Enmienda XIV los estados sólo pueden imponer contribu-

---

[10] En cuanto al alcance de la función judicial al revisar lo que constituye un "uso público" en la expropiación de propiedad privada, véanse *Berman* v. *Parker*, 348 U. S. 26 (1954); *E.L.A.* v. *Sucn. Gautier*, 81 D.P.R. 580 (1959).

ciones para un fin público y no para propósitos privados, pero que los requisitos del debido procedimiento dejan "campo libre para el ejercicio de una amplia discreción legislativa al determinar qué erogaciones servirán el interés público." Esa discreción incluye, desde luego, la asignación de fondos para el "bienestar general". "Las maneras de beneficiar el interés público están peculiarmente dentro del conocimiento de la Legislatura" y "es a ésta y no a los tribunales a la que corresponde el deber y la responsabilidad de escoger entre los posibles métodos". Por consiguiente para justificar la intervención de un tribunal se requiere "un caso claro de desviación de cualquier propósito público que razonablemente pudiera concebirse", o como se dijo en *Helvering* v. *Davis*, 301 U. S. 619, 640 (1937) "un despliegue de poder arbitrario, no una demostración de juicio". Y esa autoridad judicial, se añadió en *Everson* v. *Board of Education*, 330 U. S. 1, 6 (1947) debe ejercitarse con la "más extrema cautela". Véanse, además, *United States* v. *Butler*, supra, pág. 67; *Magnano Co.* v. *Hamilton*, 292 U. S. 40–44 (1934); *Milheim* v. *Moffat Tunnel District*, 262 U. S. 710, 717 (1923); *Green* v. *Frazier*, 253 U. S. 233, 239 (1920).

*Tercero:* El concepto de "fin público" no es uno estático, atado de por siempre a las ideas que en un momento histórico particular definieron los poderes y responsabilidades del gobierno. Está, por el contrario, indisolublemente ligado al bienestar general y, como éste, tiene que ceñirse a las cambiantes condiciones sociales de una comunidad específica y los problemas peculiares que éstas crean, y a las nuevas obligaciones que el ciudadano impone a sus gobernantes en una sociedad democrática altamente compleja. *Helvering* v. *Davis*, supra, pág. 641. Debe recordarse que "la Enmienda XIV no privó a los estados de su facultad de enfrentarse a problemas que anteriormente habían sido dejados para ser resueltos por los individuos". *Everson* v. *Board of Education*, supra, pág. 7.

*Cuarto:* Una ley no persigue un propósito privado porque ordene hacer pagos a individuos o empresas para así dar cum-

plimiento a un programa público. "Los subsidios y préstamos a individuos tales como agricultores y dueños de hogares y a sistemas de transportación poseídos privadamente, al igual que a muchas otras clases de negocios, constituyen prácticas comunes en nuestra historia nacional y estatal." *Everson* v. *Board of Education*, supra, pág. 7; *Carmichael* v. *Southern Coal Co.*, supra, pág. 518. *A fortiori*, la norma se aplica con mayor fuerza a una empresa pública.

*Quinto:* Aunque la imposición contributiva no puede anularse por la única circunstancia de que su propósito sea novedoso, no hay duda de que viene adicionalmente acreditada aquella cuyos objetivos hayan sido aprobados durante largo tiempo por el gobierno y el público. *Loan Association* v. *Topeka*, supra, págs. 664–665; *Cincinnati Soap Co.* v. *United States*, supra, págs. 314–315; *State* v. *Johnson*, 175 N. W. 589, 595–596 (Wisc. 1919).

 Una vez establecidos estos principios básicos, se desvanecen las objeciones contra la ley. Nos parece obvio que el fomento de las telecomunicaciones y el mantenimiento de un sistema telefónico y telegráfico constituían en las circunstancias económicas y sociales de 1945–47, y constituyen hoy día, una dedicación de fondos para un fin público. En verdad, es sorprendente que a estas alturas se cuestione esa facultad del gobierno. En numerosas ocasiones, tanto el Tribunal Supremo federal como otros tribunales de apelación, han aprobado la imposición de tributos y el uso de fondos públicos para actividades estatales prácticamente idénticas a las mencionadas. Algunos ejemplos son los siguientes: manufactura y mercadeo de productos derivados de la agricultura, construcción de hogares a bajo costo, establecimiento de un banco—*Green* v. *Frazier*, 253 U. S. 233 (1920); administración de un ferrocarril—*Boston* v. *Jackson*, 260 U. S. 309 (1922); construcción de un túnel para alquilarlo a empresas de ferrocarril, teléfonos, electricidad, etc.—*Milheim* v. *Moffat Tunnel District*, supra; desarrollo de recursos fluviales para usos domésticos, riego y energía eléctrica—*Gallardo* v.

*Porto Rico Ry., Light and Power Co.*, 18 F.2d 918 (1 Cir. 1927) ; plan de anuncios y exportación del café—*Márquez & Cía.* v. *Tesorero*, supra; anuncios para una industria importante—*C. V. Lloyd Fruit Co.* v. *Florida Citrus Commission*, 170 So. 248 (Fla. 1937).

Y aun en el área del derecho municipal, donde por tradición los tribunales tienden a ser más estrictos, también existen ejemplos numerosos de la misma actitud. *Jones* v. *City of Portland*, 245 U. S. 217 (1917)—almacén para la venta de combustible; *Spangler* v. *City of Mitchell*, 152 N. W. 339 (S. D. 1915)—construcción y funcionamiento de un sistema telefónico; *Standard Oil Co.* v. *City of Lincoln*, 207 N. W. 172 (Neb. 1926) conf. en 275 U. S. 504 (1927)—venta de gasolina y aceite; *City of Tombstone* v. *Macia*, 245 Pac. 677 (Ariz. 1926)—planta de hielo; *Bank* v. *Bell*, 217 Pac. 538 (1923)—mercado para la venta de alimentos; *City of Frostburg* v. *Jenkins*, 136 A.2d 852 (Md. 1957)—construcción de un edificio para industria privada; *Mitchell* v. *City of Negaunee*, 71 N. W. 646 (Mich. 1897—planta eléctrica; *Turner* v. *City of Reidsville*, 29 S.E.2d 211 (N. C. 1944)—construcción de un aeropuerto; *Allbritton* v. *City of Winona*, 178 So. 799 (Miss. 1938), apelación desestimada, 303 U. S. 627 (1938)—construcción de edificios para factorías. Véase, Antieau, *Municipal Power to Tax—Its Constitutional Limitations*, 8 Vand. L. Rev. 698, 732–738 (1955).

Cualquier duda que pudiera quedar sobre estos extremos desaparece cuando consideramos que ininterrumpidamente desde principios de siglo (¹¹) y hasta el presente y según consta

(¹¹) La primera línea telegráfica de Puerto Rico la instaló Samuel F. Morse en 1849. A fines de siglo el gobierno español administraba un sistema de 41 estaciones, el cual fue destruido por un ciclón en 1899. El régimen militar norteamericano reconstruyó el sistema y en 1901 lo traspasó al gobierno insular. Fue puesto bajo la administración del Comisionado del Interior y extendido a todas las poblaciones de la isla. En 14 de marzo de 1907 se aprobó una ley (*Leyes*, pág. 388) que autorizó al Comisionado a construir y administrar un sistema de líneas telefónicas de corta y larga distancia. No fue hasta 1914 que la peticionaria recibió la franquicia para establecer el sistema telefónico que hoy posee. Véase, Fernández García, *El Libro Azul de Puerto Rico*, 1923, págs. 702–712.

de la opinión del tribunal de instancia, el gobierno de Puerto Rico ha mantenido un sistema de comunicaciones telegráficas y telefónicas al cual se han hecho asignaciones de fondos públicos por muchos millones de dólares. Se ha ofrecido el servicio durante la administración de todos los partidos políticos y con el consentimiento de todos los gobernadores. Solamente en un caso de manifiesta dedicación de los fondos públicos a un uso completamente privado habría justificación para anular judicialmente una actividad gubernamental que en tantas ocasiones ha recibido la aprobación del gobierno y del pueblo.

 Tampoco va por buen camino la peticionaria cuando nos dice que la Autoridad de Comunicaciones no es "parte del gobierno", ni ejerce una "función de gobierno." Es facultad exclusiva del legislador la de determinar qué tipo de organización se presta mejor para el desempeño de una función pública. Si el legislador prefiere una junta o un departamento o una corporación pública a un negociado, esa preferencia, salvo disposiciones constitucionales que expresamente la prohiban, es definitiva para los tribunales. (12) La Asamblea Legislativa de Puerto Rico, por razones que a ella le parecieron suficientes, decidió que a partir de 1942 los servicios de teléfono y telégrafo que prestaba el gobierno deberían asignarse a una "corporación pública o instrumentalidad de El Pueblo de Puerto Rico" (*Leyes*, pág. 1065), la cual tendría personalidad legal separada y aparte de las del gobierno y de los funcionarios que habrían de administrarla. Como expresó el tribunal de instancia. "Basta leer la ley de su creación para concluir que es una corporación pública, que pertenece a la comunidad en general, que opera para beneficio exclusivo de ésta y no de interés privado alguno y que es una agencia o

---

(12) Desde *McCulloch* v. *Maryland*, 4 Wheat. 316, 421 (1819) el Tribunal Supremo federal reconoció que el Congreso puede crear corporaciones públicas para efectuar los poderes conferídoles por la Constitución. En cuanto a Puerto Rico, examínese *People of Puerto Rico* v. *Eastern Sugar Associates*, 156 F.2d 316, 325 (1946) cert. denegado, 329 U. S. 772 (1946).

vehículo a través del cual el Gobierno de Puerto Rico descarga ciertas funciones públicas. El que use la forma corporativa por razones de conveniencias internas de índole administrativas del gobierno, o por conveniencias de índole comerciales, no desvirtúa su naturaleza anteriormente descrita."

Si aceptáramos la contención de la peticionaria nos colocaríamos en la insostenible posición de resolver que hasta 1942 los servicios telegráficos y telefónicos eran "parte y función del gobierno" porque estaban a cargo de un negociado del Departamento del Interior, pero que a partir de esa fecha dejaron de ser "parte y función del gobierno" porque fueron de la responsabilidad de una corporación pública enteramente poseída por el mismo gobierno. (13)

En vista de todo lo anterior, resolvemos que la contribución impuesta por la Ley núm. 301 no viola el art. 3 de la Carta Orgánica.

II. *La indebida delegación de poderes*

██ Nos dice la peticionaria que la ley impugnada deja el producto de la contribución para ser invertido "al capricho de la Autoridad", que no fija normas (standards) para invertir la contribución y que por esas razones constituye una indebida delegación de poderes. Es innecesario detenernos largamente en este punto. Como expresó el tribunal de instancia: "La Legislatura impuso la contribución y determinó su cuantía; seleccionó el objeto así como el sujeto de la misma, y fijó el propósito o uso que debía dársele. De ahí en adelante, todo lo demás cae dentro del campo de la ejecución e instrumentación de la ley para dar cumplimiento a sus propósitos."

Aún en la hipótesis, no exenta de dudas, *Cincinnati Soap Co.* v. *United States*, supra, págs. 321–322, de que el requisito de normas adecuadas (standards) aplicable a las funciones

---

(13) Nuestro fallo sobre esta cuestión se limita al problema constitucional que lo causa y no debe extenderse a otros campos (responsabilidad contractual o por daños, etc.) los cuales se rigen por las determinaciones legislativas pertinentes. *Cf. Gobierno de la Capital* v. *Consejo Ejecutivo*, supra, pág. 450. La jurisprudencia citada por la peticionaria en apoyo de su contención se refiere precisamente a estos últimos problemas.

reguladoras del estado tenga igual vigencia en el campo de las erogaciones públicas, es claro que las normas provistas por la Ley núm. 301 pasan la prueba constitucional. Ciertamente, no son menos precisas que la del "interés, conveniencia y necesidad públicos" aprobada en *NBC* v. *United States*, 319 U. S. 190 (1943) o la de "ganancias excesivas" aprobada en *Lichter* v. *United States*, 334 U. S. 742 (1948) o la de "métodos ilícitos de competencia" aprobada en *Federal Trade Commission* v. *Gratz*, 253 U. S. 421 (1920). Examínense además, *Yakus* v. *United States*, 321 U. S. 414 (1944); *United States* v. *Rock Royal Cooperative*, 307 U. S. 533 (1939); 1 Davis, *Administrative Law Treatise*, (1959) págs. 81–87.

III. *Exacción forzosa de la propiedad de la peticionaria so pretexto del poder contributivo.*

IV. *Falta de uniformidad y privación de la propiedad sin el debido proceso de ley.*

Discutimos estas objeciones conjuntamente porque en realidad constituyen una sola. En síntesis la peticionaria sostiene que solamente ella, como cuestión práctica, paga la contribución y que el producto de la misma se ha gastado para el beneficio "directo" de los habitantes de Caguas y pueblos limítrofes a los cuales presta servicios la Autoridad de Comunicaciones. Los habitantes de los demás pueblos sólo se benefician "indirectamente" por la interconexión del sistema de la peticionaria con el de la Autoridad en llamadas de larga distancia. Además, la peticionaria "no recibe ningún beneficio peculiar de la inversión de que ha sido objeto la contribución . . .", mientras "que todo el conglomerado de contribuyentes ha sido eximido de aportar dinero alguno al fondo especial . . . ." Por esas razones sostiene que la contribución constituye una exacción forzosa, viola la regla de uniformidad y le priva de su propiedad sin el debido proceso de ley. Veamos las consideraciones aplicables.

*Primera:* El problema de si la peticionaria puede o no recibir beneficios "directos" del fondo que establece la sec. 2

de la Ley núm. 301 no está planteado frontalmente en este recurso. Es, además, innecesario resolverlo porque las normas constitucionales pertinentes no se fundan en la determinación de ese hecho.([14]) Conviene indicar, sin embargo, que si bien en los años a los cuales se refiere este litigio solamente la Autoridad recibió dinero de dicho fondo, la prueba demuestra que la peticionaria en ningún momento solicitó asignaciones del mismo ni que se destinara parte del dinero para "experimentos o investigaciones" que le beneficiaran directamente. Además, es un tanto eufemístico catalogar de "indirectos" los beneficios que la peticionaria admitidamente recibe por llamadas de larga distancia a los pueblos que sirve la Autoridad, en los cuales, como demostró la prueba, mediante el uso de los dineros del fondo especial y de cuantiosas asignaciones de los fondos generales, se ha multiplicado el número de abonados y se ha extendido y mejorado notablemente el servicio.

◼ *Segunda:* En modo alguno es inconstitucional una contribución porque la inversión de su producto no beneficie a aquéllos que la pagan.([15]) "Nada hay más corriente en el campo contributivo que la imposición de un tributo a una clase o a individuos que no gozan de ningún beneficio directo de su inversión o que no son responsables de las condiciones que se desea remediar.

"Una contribución no es un prorrateo de beneficios. Es, como hemos dicho, una manera de distribuir el peso del costo del gobierno. Como cuestión constitucional, el único beneficio al cual tiene derecho el contribuyente es el que deriva de

---

([14]) Según consta del expediente, los funcionarios de la Autoridad son de opinión que no pueden hacer mejoras en el territorio servido por la Porto Rico Telephone Co. Esa determinación, desde luego, no obliga a la peticionaria ni a los tribunales y deberá dilucidarse en un procedimiento judicial apropiado.

([15]) Tampoco lo es, desde luego, por el *solo* hecho de que restrinja o destruya ciertas ocupaciones o negocios. *Magnano Co.* v. *Hamilton,* supra, págs. 44–47; Cushman, *Social and Economic Control Through Federal Taxation,* 18 Minn. L. Rev. 757, 763–764 (1934).

su participación en el privilegio de vivir en una sociedad organizada, establecida y protegida por la dedicación de las contribuciones a propósitos públicos. Cualquier otro criterio impediría la imposición de contribuciones excepto como compensación por el gravamen que pesa sobre aquéllos que las pagan, y requeriría el abandono del principio más fundamental de gobierno—que el mismo existe para proveer para el bien común. Por el hecho de que no tenga niños, una corporación no puede objetar que se usen las contribuciones que paga para el sostenimiento de las escuelas. Este Tribunal ha repudiado la idea, cada vez que se le ha ofrecido, de que la Constitución requiere que los beneficios que se derivan del gasto de los fondos públicos se distribuyan de acuerdo con las cargas del contribuyente, o que éste puede resistir el pago de una contribución, porque no se gasta para propósitos que le benefician especialmente." *Carmichael* v. *Southern Coal Co.*, supra, págs. 521–523. Véanse, además, *Rapid Transit Corp.* v. *New York*, 303 U. S. 573, 584–587 (1938) ; *Magnano Co.* v. *Hamilton*, supra, pág. 43.

*Tercera :* La peticionaria no afirma, ni está en posición de afirmar, que el impuesto de la Ley núm. 301 viole el debido procedimiento de ley y la igual protección de las leyes porque se aplique exclusivamente a las compañías de teléfono y telégrafo que funcionen en Puerto Rico. Considerada la amplísima potestad legislativa de establecer clasificaciones razonables en la imposición de contribuciones, la ya descrita clasificación no es arbitraria ni opresiva ni caprichosa. *Citizens' Telephone Co.* v. *Fuller*, 229 U. S. 322 (1913) ; *Nashville C. & St. L. Ry.* v. *Browning*, 310 U. S. 362, 368 (1940) ; *Steward Machine Co.* v. *Davis*, 301 U. S. 548, 584 (1937) ; *Rapid Transit Corp.* v. *New York*, supra, págs. 578–581; *Carmichael* v. *Southern Coal Co.*, supra, pág. 509; *Walters* v. *City of St. Louis*, 347 U. S. 231, 237 (1954) ; *South Porto Rico Sugar Co.* v. *Buscaglia*, 154 F.2d 96, 100 (1 Cir. 1946). Y es obvio que "las disposiciones de

la ley que designan el uso de los fondos recaudados, no tienen importancia al determinarse si es o no discriminatoria la clasificación establecida por la ley impugnada." *Rapid Transit Corp.* v. *New York*, supra, pág. 587.

La discreción legislativa no se reduce porque la clase descrita en la ley, como cuestión de realidad, incluya un solo contribuyente. Las empresas de servicio público—en especial las de teléfono, telégrafo, electricidad, agua y algunas de transporte—usualmente se encuentran en esa posición. Por razones conocidas, el estado con gran frecuencia concede a esas empresas el monopolio del servicio en áreas específicas, sujeto como sabemos a una detallada reglamentación de sus actividades. El otorgar ese monopolio no impide al estado, sin embargo, imponerle contribuciones especiales por el privilegio que les dispensa o incluirlas razonablemente dentro de una clase particular de contribuyentes. Lo contrario significaría que la empresa habría adquirido, junto al monopolio, una exención contributiva sobre el privilegio de su franquicia y sobre sus actividades de negocio y que el estado no podría imponerle contribución especial alguna y sí únicamente aquellas de tipo general—ingreso, propiedad, arbitrios—que pagan todos los demás contribuyentes. Esa tesis ha sido rechazada repetidamente por el Tribunal Supremo federal. *Puget Sound Co.* v. *Seattle,* supra, pág. 627; Cf. *Rapid Transit Corp.* v. *New York,* supra, págs. 588-596.

*Cuarta:* Las sentencias del Tribunal Supremo federal "no dejan dudas de que en beneficio del interés público, un estado puede constitucionalmente ocuparse en un negocio que corrientemente realiza la empresa privada, imponer una contribución para mantenerlo y competir con los intereses privados que participan en la misma actividad". *Puget Sound Co.* v. *Seattle,* supra, pág. 624; *Constitutional Limitation on Sovereign Competition,* 13 Temple L. Q. 415, 457-458 (1939).

 *Quinta:* La regla de uniformidad contributiva incorporada en la Carta Orgánica exige, al igual que la disposición federal, uniformidad geográfica y no intrínseca— *Steward Machine Co.* v. *Davis,* supra, pág. 583; *South Porto Rico Sugar Co.* v. *Buscaglia,* supra, pág. 100; *Rullán* v. *Buscaglia,* 168 F.2d 401, 403 (1 Cir. 1948)—y es obvio que no se viola en el presente caso. Tampoco guarda relación alguna con esa regla la manera en que se gaste el producto de la contribución. Esto es algo que pertenece a la determinación de si el impuesto es para un "fin público" o no. Y, desde luego, el hecho de que un grupo de ciudadanos resulte más beneficiado que otros por una mejora o un servicio público no es, como ya hemos visto, por sí solo índice de que la contribución invertida en tal mejora o servicio no sea para un "fin público". (¹⁶) Estamos rodeados de cientos de obras y servicios públicos que por el hecho físico de su ubicación benefician más "directamente" a unos ciudadanos que a otros. Sería imposible administrar los fondos públicos si se adoptara la norma contraria.

Una vez establecido que el impuesto es para un "fin público" y que la clasificación impositiva es válida y cumple con la regla de uniformidad geográfica, procede sostener su constitucionalidad aun cuando la inversión de su producto beneficie más a unos ciudadanos que a otros y en modo alguno, si así fuera en este caso, al contribuyente que la paga.

V. *La ley es nula porque prohibe pasar la contribución al consumidor.*

 Sostiene la peticionaria que la disposición de la Ley núm. 301 que prohibe cargar el impuesto a las personas que utilicen los servicios telefónicos y telegráficos es nula "porque no puede constitucionalmente obligarse al que vende

---

(¹⁶) La misma regla prevalece en las expropiaciones de propiedad para "uso público". *Rindge Co.* v. *Los Angeles,* 262 U. S. 700 (1923); *Mt. Vernon Cotton Co.* v. *Alabama Power Co.,* 240 U. S. 30, 32 (1916).

artículos de comercio a absorber al fin el peso de una contribución, que es un gasto, y prohibírsele que la recobre en alguna forma".

El tribunal de instancia resolvió correctamente que la mencionada prohibición de la ley se aplica en la práctica únicamente a la Autoridad de Comunicaciones debido a que ésta es la única autorizada a fijar sus tarifas sin la intervención de ningún otro organismo oficial. La peticionaria, por el contrario, no puede aumentar sus tarifas sin la aprobación de la Comisión de Servicio Público. Tenemos que aceptar, desde luego, que el legislador conocía ese hecho básico. Igualmente debemos aceptar, como lo hizo el tribunal de instancia, que la Asamblea Legislativa al momento de aprobar la Ley núm. 301 sabía que la peticionaria tenía derecho, como cuestión constitucional y de ley, a obtener ganancias razonables de su empresa y que no intentó prohibir que se tomara en cuenta el impuesto de la Ley núm. 301 en la determinación de las tarifas. *Galveston Electric Co.* v. *City of Galveston,* 258 U. S. 388, 399 (1922) ; *Georgia Railway and Power Co.* v. *Railroad Commission,* 262 U. S. 625, 633 (1923). Era, por consiguiente, ante la Comisión de Servicio Público que la peticionaria tenía que plantear, en primera instancia, los efectos del nuevo impuesto, en una solicitud de aumento de tarifas.([17]) Pudo haber hecho esto tan pronto entró en vigor la Ley núm. 301, y como el impuesto se paga anualmente, hubiese tenido amplia oportunidad de recobrarlo si la Co-

---

([17]) Nos señala la peticionaria que la práctica de las comisiones de servicio público en los Estados Unidos, es la de autorizar a las empresas "a cobrarle directamente a sus clientes la contribución en las facturas mensuales como un recargo . . . . y no abrir un proceso tarifario . . . . cada vez que surge una nueva contribución". Afirma que la Ley núm. 301 prohibe este procedimiento. Aparte de que la peticionaria en realidad se está quejando de que se le hubiese podido negar algo que ella nunca solicitó, no creemos que la Ley núm. 301 por sí sola constituya un obstáculo para el antedicho procedimiento, si es que el mismo está autorizado por nuestras leyes de servicio público.

misión le hubiese otorgado la necesaria autorización. Sin embargo, la peticionaria prefirió esperar a 1949 para solicitar un aumento. Esa solicitud, como vimos en la relación de hechos probados, se debió a aumentos considerables en salarios y otras condiciones de empleo que durante varios años la peticionaria hizo a sus empleados. La única conclusión que surge de esos hechos es la de que la Porto Rico Telephone Co., por razones que ella estimó buenas, decidió que el aumento en sus gastos causado por el impuesto de la Ley núm. 301 no era razón suficiente para solicitar de la Comisión un aumento de tarifas. Tomada esa decisión, no puede ahora la peticionaria aducir como causa de inconstitucionalidad que la Ley núm. 301 le prohibió pasar el impuesto a los usuarios del servicio.

Conviene aclarar, además, que la prohibición legislativa de pasar un tributo al consumidor no es por sí sola y en todas las circunstancias, fundamento de inconstitucionalidad. *Rapid Transit Corp.* v. *New York*, supra, págs. 581–582; *Southern Boulevard R. Co.* v. *City of New York*, 86 F.2d 633, 637 (2 Cir. 1936) cert. denegado 301 U. S. 703 (1937). Nuestro fallo en *Pyramid Products* v. *Buscaglia*, 64 D.P.R. 828, 850 (1945), principal precedente que cita la peticionaria, tiene por base la retroactividad del impuesto. Esa circunstancia no está presente en el caso que nos ocupa.

Por las razones vertidas en esta opinión, fallamos que la sec. 2 de la Ley núm. 301 de 15 de mayo de 1945 es constitucional tanto a la luz de las disposiciones aplicables de la Carta Orgánica de 1917 como de aquellas de la Constitución federal.

*Se confirmará la sentencia recurrida.*

Los Jueces Presidente Sr. Negrón Fernández y Asociado Sr. Santana Becerra no intervinieron.